**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2765-18
                         A-2860-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ALEX TORRES,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

OSVALDO CORREA-MARTINEZ,
a/k/a OSBALDO CORRERA,
MANUEL MARTINEZ,
OSVALDO CORREA,
OSVALDO CORREAMARTINEZ,
and OSVALDO MARTINEZ,

      Defendant-Appellant.

_____

Argued (A-2765-18) and Submitted (A-2860-18)

December 7, 2021 – Decided January 27, 2022

Before Judges Messano and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 17-01-0045.

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant Alex Torres (Joseph E. Krakora, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant Osvaldo Correa-Martinez (John Douard, Assistant Deputy Public Defender, of counsel and on the brief).

Mark Niedziela, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Mark Niedziela, of counsel and on the briefs).

Appellant Osvaldo Correa-Martinez filed a pro se supplemental brief.

PER CURIAM

These appeals arise from the joint trial of defendants Alex Torres and Osvaldo Correa-Martinez. We calendared the appeals back-to-back and now consolidate them to issue a single opinion.

A Passaic County grand jury indicted both men for third-degree possession of heroin, N.J.S.A. 2C:35-10(a) (count one); third-degree distribution of heroin, and third-degree possession of heroin with intent to

distribute, N.J.S.A. 2C:35-5(a)(1) (counts two and four); third-degree distribution, and third-degree possession with intent to distribute heroin in a school zone, N.J.S.A. 2C:35-7 (counts three and five); three counts of second-degree unlawful possession of a handgun, one count for each of three firearms, N.J.S.A. 2C:39-5(b)(1) (counts six, seven, and eight); three counts of second-degree possession of a handgun in the course of committing a drug crime, N.J.S.A. 2C:39-4.1(a) (counts nine, ten, and eleven); three counts of third-degree receiving stolen property, i.e., the three handguns, N.J.S.A. 2C:20-7 (counts twelve, thirteen, and fourteen); fourth-degree possession of a large capacity magazine, N.J.S.A. 2C:39-3(j) (count fifteen); and fourth-degree possession of hollow-point bullets, N.J.S.A. 2C:39-3(f)(1) (count sixteen). Correa-Martinez was also indicted for possession of a handgun having previously been convicted of certain crimes, N.J.S.A. 2C:39-7(b)(1) (count eighteen).[1]

---

[1] The indictment also included a single count against Blady O. Diaz, charging him with possession of heroin. The State alleged that Diaz bought heroin from defendants, and that sale was the subject of counts two and three of the indictment. Diaz was not tried with defendants, and the record does not reveal any disposition of the single charge against him.

Defendants were tried before a jury after their motions to suppress were denied. The jury convicted both defendants of unlawful possession of one handgun, a 9mm. Luger; possession of stolen property, the Luger; and possession of a large capacity magazine; it also convicted Torres of possessing hollow-nosed bullets, but acquitted Correa-Martinez of that charge. The jury acquitted both defendants of all other counts of the indictment.[2]

After denying defendants' post-verdict motions, the judge sentenced Torres to seven years' imprisonment with a forty-two-month parole disqualifier pursuant to the Graves Act, N.J.S.A. 2C:43-6(g), for the handgun conviction, and imposed consecutive sentences of four years' imprisonment for receiving stolen property, nine months' imprisonment for the large capacity magazine and nine months' imprisonment for the hollow-point ammunition conviction, for an aggregate sentence of twelve and one-half years' imprisonment with forty-two-months of parole ineligibility.

The judge sentenced Correa-Martinez to an eight-year term of imprisonment on the handgun conviction with a forty-two-month period of parole ineligibility, and consecutive terms of four-years on the stolen property

---

[2] After the jury returned its verdict, the State dismissed the certain persons count against Correa-Martinez.

A-2765-18

conviction and twelve months on the extended magazine conviction, for an aggregate sentence of thirteen years' imprisonment with forty-two-months of parole ineligibility.

Torres raises the following points for our consideration:

POINT I

THE COURT IMPROPERLY INTERFERED IN DELIBERATIONS AND COERCED A VERDICT WHEN IT FAILED TO ADDRESS TWO JURORS' SCHEDULING CONCERNS AND REQUIRED ALL JURORS TO INDIVIDUALLY REAFFIRM THAT THEY WOULD NOT LET ANY TIME CONSTRAINTS INFLUENCE THEIR VERDICT. (Not Raised Below)

POINT II

THE IMPROPER ADMISSION OF THE LEAD DETECTIVE'S OPINION TESTIMONY ABOUT NARCOTICS TRANSACTIONS AND CRIME "HOT SPOTS" REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT III

THE INFORMATION FROM THE NCIC[3] RECORDS WAS INADMISSIBLE TESTIMONIAL HEARSAY.

---

[3] This is an acronym for the National Crime Information Center. See State v. McGee, 131 N.J. Super. 292, 295 n.1 (App. Div. 1974):

> N.C.I.C. is a government agency which, among other functions, receives reports from police authorities

ITS ERRONEOUS ADMISSION REQUIRES REVERSAL OF THE RECEIVING STOLEN PROPERTY CHARGE. (Not Raised Below)

POINT IV

THE COURT'S IMPROPER FINDING AND WEIGHING OF AGGRAVATING FACTORS AND FAILURE TO CONDUCT ANY YARBOUGH[4] ANALYSIS RENDERS DEFENDANT'S SENTENCE EXCESSIVE.

Correa-Martinez raises the following points:

POINT I

[SERGEANT] JUDEH LACKED REASONABLE, ARTICULABLE SUSPICION TO JUSTIFY OPENING THE PASSENGER DOOR AND REMOVING CORREA-MARTINEZ, AND THEN ENGAGING IN A SEARCH.

POINT II

THE JUDGE ABUSED HIS DISCRETION BY FAILING TO DISTINGUISH BETWEEN THE STANDARD OF PROOF OF A PERMISSIVE

throughout the entire country concerning stolen guns. The information received is fed into a computer. Upon receipt of inquiries concerning stolen guns from police authorities, the computer will emit a printout which indicates whether a given gun has been reported as stolen, a description of the gun, the date allegedly stolen and the name of the police agency which made the initial report of the theft.

[4] State v. Yarbough, 100 N.J. 627 (1985).

6

INFERENCE AND THE BEYOND-A-REASONABLE-DOUBT STANDARD OF PROOF OF AN ELEMENT OF A CRIME[] BY INSTRUCTING THAT THE JURORS COULD FIND CONSTRUCTIVE POSSESSION OF THE HANDGUN IF THEY INFERRED THAT POSSESSION WAS "MORE PROBABLE THAN NOT." U.S. CONST. AMEND. XIV; N.J. CONST. ART. I, PARA. 1. (Partially Raised Below)

POINT III

THE IMPROPER ADMISSION OF THE LEAD DETECTIVE'S OPINION TESTIMONY ABOUT NARCOTICS TRANSACTIONS AND CRIME "HOT SPOTS" REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.[5]

POINT IV

THE COURT IMPROPERLY INTERFERED IN DELIBERATIONS AND COERCED A VERDICT WHEN IT FAILED TO ADDRESS TWO JURORS' SCHEDULING CONCERNS AND REQUIRED ALL JURORS TO INDIVIDUALLY REAFFIRM THAT THEY WOULD NOT LET ANY TIME CONTRAINTS INFLUENCE THEIR VERDICT. (Not Raised Below)

POINT V

THE INFORMATION FROM THE NCIC RECORDS WAS INADMISSIBLE TESTIMONIAL HEARSAY. ITS ERRONEOUS ADMISSION REQUIRES REVERSAL OF THE RECEIVING STOLEN PROPERTY CHARGE. (Not Raised Below)

---

[5] We eliminated the sub-points in defendant's brief.

7

POINT VI

THE COURT'S IMPROPER FINDING AND WEIGHING OF AGGRAVATING FACTORS AND INCOHERENT <u>YARBOUGH</u> ANALYSIS RENDERS DEFENDANT'S SENTENCE EXCESSIVE.

In a pro se supplemental brief, Correa-Martinez raises the following:

POINT ONE

TWO JURORS SPOKE TO SERGEANT JUD[E]H, WHO WAS THE SECOND WITNESS FOR THE STATE, OUTSIDE OF THE COURTOOM. THIS WAS CONTRARY TO DEFENDANT-APPELLANT'S FAIR TRIAL RIGHTS, RIGHT TO CONFRONT WITNESSES, AND DUE PROCESS RIGHTS IN VIOLATION OF THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUION.

POINT TWO

AFTER FIVE DAYS OF DELIBERATION, THE JURY RETURNED WITH AN INCONSISTENT VERDICT WHEN THEY FOUND DEFENDANT-APPELLANT'S CODEFENDANT . . . GUILTY ON COUNTS EIGHT, FOURTEEN, FIFTEEN, AND SIXTEEN — AND THEY ALSO FOUND DEFENDANT-APPELLANT GUILTY OF COUNTS EIGHT, FOURTEEN, FIFTEEN — BUT <u>NOT</u> GUILTY ON COUNT SIXTEEN.

We have considered these arguments in light of the record and applicable legal standards. We conclude the judge improperly admitted hearsay evidence regarding information police obtained from an NCIC search, and that alone

requires reversal of defendants' convictions for possessing a stolen firearm. We also agree that the judge improperly admitted other significant, prejudicial opinion and hearsay testimony, mostly over defense counsels' objections. Although the jury acquitted defendants of all charges involving the heroin, which was the focus of most of this inadmissible evidence, we conclude the testimony was grossly prejudicial, infected the fairness of the trial, and was clearly capable of bringing about an unjust result. R. 2:10-2. We therefore reverse defendants' convictions and remand to the trial court for further proceedings consistent with this opinion.

I.

We begin by focusing on the trial testimony of Paterson Police Detective Wilson Lazu, who on the evening of June 14, 2016, was investigating a home on Rosa Parks Boulevard along with other members of the Narcotics Division. Lazu, the "lead detective," was surveilling the building from a minivan parked across the street, while communicating by encrypted radio transmissions with other members of the team situated elsewhere. Lazu was about forty feet away from the "target location," but could see clearly because of a streetlight and porchlights on neighboring houses.

The following occurred between the Prosecutor and Lazu early in the

testimony:

> Prosecutor: [I]f you could just describe that area to the ladies and gentlemen of the jury?
>
> Det. Lazu: It's a high crime area. It's residential. It has some businesses on that street. It's known as one of the hot spots in the city.
>
> Prosecutor: Why is it called a hot spot?
>
> Det. Lazu: Because of the crime and the
>
> . . . .
>
> Det. Lazu: — high level of narcotics.

Lazu finished his answer over defense counsel's objection, but the judge then called the attorneys to sidebar. Defense counsel explained that the testimony was irrelevant and highly prejudicial. The prosecutor claimed the testimony went "to why the [d]etective's in the area conducting surveillance." The judge overruled the objection.

The prosecutor resumed questioning Lazu where he left off:

> Prosecutor: Detective, once again, can you just explain what a hot spot means?
>
> Det. Lazu: A hot spot is normally where there's high crime, <u>previous shootings</u>, high level of narcotics investigations have been conducted in these areas. . . . [T]here's many in the city and that's one of them. That area is one on the list.

A-2765-18

[(Emphasis added).]

Shortly thereafter, the following exchange occurred:

> Prosecutor: [W]hen you're making your observations, when you first get there[,] what do you observe at the location . . . ?
>
> Det. Lazu: I observed several individuals . . . coming in and out of the house within a short period of time inspecting several items in their hands, which is the common behavior of . . .
>
> . . . .
>
> Det. Lazu: — buying drugs.

Lazu once again finished his answer over defense counsel's objection, which the judge again overruled.

Lazu said he saw five such people, one of whom he "kind of identified from a previous narcotics arrest." When the prosecutor again asked the detective to explain the behavior of these people leaving the house, Lazu responded: "I couldn't see what they were looking at, but they were looking at it and walking at a fast pace. . . . That's the normal behavior of . . . ." Defense counsel again objected, and the judge again overruled the objection. Lazu continued, stating these people were "counting what I believe to be some sort of narcotics in their hands." Lazu reached this conclusion through his "training and experience."

11

After surveilling the house for approximately fifteen minutes, Lazu saw defendants exit the house and go to a Honda parked in the driveway. Torres carried a "dark object," about fourteen inches long, in both hands, and Lazu saw him through the open car door place it under the driver's seat. Correa-Martinez guided Torres as he backed the car out of the driveway, and then entered on the passenger side.

Lazu saw a black SUV approach moments later and park behind the Honda, which was double parked in the street. Blady Diaz exited the SUV and approached the passenger side of the Honda. Lazu saw "an exchange" with Correa-Martinez and "believe[d] . . . [i]t was an exchange of paper currency and narcotics." Defense counsel objected; the judge sustained the objection but suggested that the prosecutor "get into [Lazu's] training and experience."

The prosecutor then asked the detective a series of questions in that area, and followed with, "based upon your training and experience[,] what did you believe had just taken place?" The judge overruled defense counsel's objection, and Lazu answered, "A narcotics transaction." Both cars drove off, and Lazu radioed members of the backup units with their descriptions.

Other detectives apprehended defendants and Diaz. As lead detective, Lazu testified that he knew monies were seized from defendants, however, he

12

explained the absence of any reference to seized monies in police reports by telling jurors, "[i]t was . . . insufficient funds." Lazu claimed it was police practice not to confiscate money from arrestees if the total was less than $150. He explained in that case, any money would become the personal property of a defendant and returned to him.

Lazu said he was aware that guns were seized as part of the investigation, and, as he began to explain the procedure following seizure of a gun, there was an objection. Defense counsel said Lazu lacked personal knowledge because he did not seize the weapons; counsel later withdrew the objection after the judge overruled it at sidebar. Lazu explained police "check if [the guns are] stolen" by "run[ning] them through NCIC." We quote completely the balance of Lazu's testimony, the only testimony, regarding the NCIC inquiry.

> Prosecutor: What's NCIC?
>
> Det. Lazu: It's the [n]ational database to tell us if [the guns are] stolen or not, what location and who the owner is.
>
> Prosecutor: [W]hat do you use, or what information do you use to find out whether or not a weapon has been reported stolen?
>
> Det. Lazu: The description, model number and the serial number.

A-2765-18

Prosecutor: Now, if you recall in this case were the weapons recovered . . . run through NCIC?

Det. Lazu: Yes.

Prosecutor: And what were the results?

Det. Lazu: They were all three stolen.

Prosecutor: [D]o you recall where they were stolen from?

Det. Lazu: One was from Los Angeles, California, the other one was from Little Rock, Arkansas, and the third was Atlanta, Georgia.

Lazu was vigorously cross-examined and admitted that a report he prepared omitted any mention of observed narcotics transactions at the house or that monies were confiscated from either defendant. At one point, Lazu said he recalled Torres had some money on him when arrested but could not recall how much. Correa-Martinez's counsel had Lazu identify a report indicating that when Correa-Martinez was arrested, he had no money in his personal property.

Several other members of Lazu's team also testified. Detective Sergeants Sal Judeh, Anthony DeGiglio, and Eric Montoya, detained defendants after they had driven to a nearby gas station. Surveillance cameras captured most of the

14

interaction; defense counsel secured the video footage and turned it over to the State prior to trial.[6]

Judeh drove to the gas station with the other two officers and parked his SUV on an angle in front of defendants' Honda. He proceeded to the passenger side and asked Correa-Martinez to exit the car, at which point he did a "pat down" for his own safety. He told DeGiglio "to look in the car and . . . see if there's anything on the floor of the car." The surveillance video shows both the "pat down" of Correa-Martinez and DeGiglio leaning into the front of the car from the passenger side utilizing a flashlight. Neither the pat down nor DeGiglio's search of the Honda resulted in the seizure of any evidence.

However, Judeh said, "due to the matter at hand" he decided to slide into the Honda from the passenger side to "see if there were any . . . weapons in the car." Judeh saw a "large black handgun," a 9mm. Luger, with the "magazine part" under the driver's seat and the "top part" visible on the floorboard. He told the other two officers, who immediately placed handcuffs on defendants; Judeh gave the gun to DeGiglio.

The actual recovery of the gun is not visible in the video footage, a fact the prosecutor acknowledged in summation. However, the video does show

---

[6] The video recording is part of the appellate record.

DeGiglio, standing next to the open driver's side door, leaning in while Judeh leaned in from the passenger side, and DeGigilo emerging with a weapon. DeGiglio later testified that he made the weapon safe by removing its extended ammunition clip and a live round from its chamber. The video footage shows these actions. Judeh said there were nineteen rounds of ammunition, including some hollow nose bullets, in the magazine.

Detective Sergeant Montoya testified that as police arrived at the gas station, he saw the Honda and defendant reaching down "kind of below his seat." He told his fellow officers, "[H]e's reaching down[,] be careful." Montoya went to the driver's side of the Honda and ordered Torres out of the car. He conducted a pat down search, which can be seen in the video, but recovered "[n]othing of evidence." After Montoya heard Judeh say "gun," he immediately placed Torres under arrest in handcuffs.

Montoya said both defendants were brought to another police vehicle commandeered by Sergeant Huntington, out of the field of view of the surveillance camera, before conducting a further search of the Honda. Police found no other evidence in the car. When Montoya returned to Huntington's vehicle, they pulled Torres out of the car and searched him again because Huntington claimed, "he's sitting funny." Montoya said they found a .380

16

caliber handgun in Torres' pants, between his waist and "rectum area"; one of the rounds in the gun was a hollow-nose bullet. Montoya also found "[seven] heroin glassine folds" and a "brownish prescription bottle" in Torres' waistband. The heroin bore a distinctive purple stamp, "Ferrari." None of this was captured on the surveillance video.

The judge gave the next witness, Sergeant DeGiglio, a cautionary instruction outside the presence of the jury before he was sworn.[7] The judge repeated a similar instruction when the last police witness, Detective Mohan Singh, testified immediately after DeGiglio.

> The way you will proceed in this case is the State's only presenting evidence from the time, I guess it was Lazu was at [the Rosa Parks Boulevard house] and he made observations going forward. Anything about what led up to him being there, anything that was any anonymous tips or anything like that are not part of this case.[8]
> So if anybody asks you questions that you think the answer might relay to what happened before[,] just say you don't understand the question, all right? Don't

---

[7] The record does not reveal why the judge choose to do this before the last two police witnesses testified.

[8] During his testimony at the evidentiary hearing on defendants' motion to suppress, Lazu said he had received an anonymous tip from a "neighbor" of the house on Rosa Parks Drive, complaining of drug sales out of the house by two Hispanic men. The motion to suppress was heard by a different judge, not the trial judge.

A-2765-18

give any information about what led up to what happened.

DeGiglio said when the officers removed defendants from the Honda at the gas station, he did a "cursory" search of "[j]ust the passenger areas of the vehicle" and found nothing. After Judeh found the gun, DeGiglio handcuffed Correa-Martinez, made the gun safe and walked Correa-Martinez to Sergeant Huntington's car. He again searched Correa-Martinez and now found a small .22 caliber handgun in the "left front change pocket" of defendant's pants. DeGiglio did not seize any drugs or money from Correa-Martinez.

On Lazu's instructions, Detective Singh stopped Diaz's car after it left the area of the surveillance and recovered three glassine envelopes of heroin from Diaz; they bore a purple "Ferrari" ink stamp. New Jersey State Police Detective Joshua Smith testified as a ballistics expert regarding the operability of the three guns. After certain stipulations, the State rested.

Torres, who was forty-five-years old and had never been convicted of a crime, testified. Torres admitted being at the house on Rosa Parks Boulevard, where he rented a room he used to rendezvous with a paramour. He said Correa-Martinez also rented a room at the house.

On the night in question, Torres, who worked as an auto mechanic, took the Honda, a customer's vehicle, to get gas and cigarettes. He agreed to give

Correa-Martinez a ride to also buy some cigarettes. Torres said that as he waited in the car for the station attendant to pump the gas, Correa-Martinez entered the market at the station and then returned to the vehicle. That was when Detectives Judeh, Montoya and DeGiglio arrived and ordered them out of the car.

Torres denied placing a gun under the seat of the car. Over the State's forceful objection, the judge permitted Torres to identify one photograph of the footwell of the driver's side of the Honda to support his testimony that the space between the seat and the floor was too narrow to secrete a weapon the size of the Luger. Torres denied ever possessing any drugs or weapons or engaging in any drug sales.

## II.

## A.

It was error to permit Lazu to testify about information obtained from NCIC because it was inadmissible hearsay. "Hearsay" is "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." N.J.R.E. 801(c). Hearsay is inadmissible unless a recognized hearsay exception applies. N.J.R.E. 802. "Testimony that the information was received from a specific source such as NCIC, . . . violates the hearsay rule, and,

moreover, 'violates the accused's Sixth Amendment right to be confronted by witnesses against him.'" State v. Underwood, 286 N.J. Super. 129, 139 (App. Div. 1995) (quoting State v. Bankston, 63 N.J. 263, 268–69 (1973)).

N.J.R.E. 803(c)(6) is an exception to the hearsay rule, and provides:

> A statement contained in a writing or other record of acts, events, conditions, and, subject to Rule 808, opinions or diagnoses, made at or near the time of observation by a person with actual knowledge or from information supplied by such a person, if the writing or other record was made in the regular course of business and it was the regular practice of that business to make such writing or other record.

In Underwood, we intimated that NCIC reports might be admissible under this exception "as records of a regularly conducted business activity, if certain criteria are met." 286 N.J. Super. at 139 (citing McGee, 131 N.J. Super. at 298). Specifically, the State must establish:

> (a) how and when the information furnished by the owner . . . was passed . . . to the . . . police; (b) how and who fed the information into the computer; (c) who programmed the computer and how it was done; how the data was retrieved from the computer; the accuracy of those who operated the computer.
>
> [McGee, 131 N.J. Super. at 298.]

The State failed to carry its burden in Underwood, because "the NCIC information came from an anonymous caller, [and] the State could not establish who reported the car stolen." 286 N.J. Super. at 139.

The facts in McGee are similar to this case. There, the defendant's car was stopped by a State Trooper who, with the defendant's consent, searched the vehicle and found a gun under the driver's seat. 131 N.J. Super. at 295. Police ran the weapon through NCIC and were "advised by someone at the N.C.I.C. terminal that the gun found in defendant's car answered the description furnished to it by the . . . [p]olice [d]epartment . . . , and that it had been stolen." Ibid. The judge admitted the testimony over the defendant's objection, concluding it was trustworthy and admissible under the business records exception to the hearsay rule. Id. at 295–96.

The defendant was convicted of unlawful possession of the weapon and bringing a stolen gun into the State. Id. at 294. We concluded the NCIC information was improperly admitted, the State having failed to establish the criteria we cited above. Id. at 298. "Since the only proof presented to show that the gun was stolen was improperly admitted, the conviction of [the] defendant for bringing a stolen gun into the State must be reversed." Ibid. We also reversed the defendant's conviction for unlawful possession of the gun,

21

concluding, "the resulting prejudice had a strong tendency to spill over and taint the verdict on the charge of possessing a gun without a permit. Any other conclusion would be highly speculative and unwarranted under the circumstances." Id. at 299.

The State's contention that Lazu's testimony supplied the necessary predicates to admit the NCIC information is without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(2). We acknowledge the State's argument that defendants failed to object on hearsay grounds and later withdrew any objection. However, the judge had already overruled defendants' objection before the withdrawal.

Recently, in State v. Carrion, the Court considered whether "admission of an affidavit attesting that a search of a State firearm registry revealed no lawful permit for an individual's possession of a handgun" violated the defendant's Sixth Amendment right to confrontation. ___ N.J. ___, ___ (2021) (slip op. at 2). The Court concluded that "[s]uch raw data, collected for a neutral administrative purpose, is not testimonial." Id. at 19. Nonetheless, "a witness was required to explain the accuracy of the information entered into the database search for the existence of a firearm permit issued to Carrion, but no such witness was presented." Ibid. As noted, defense counsel objected to Lazu's lack

22

of personal knowledge about how the NCIC information was obtained, and Lazu provided no testimony regarding that issue except in the most general of terms.

Most importantly, neither Lazu nor any other witness supplied evidence proving the Luger was stolen from a specific person in a specific state. The answer we quoted above — the three guns were reported stolen from three states — was the entirety of the State's evidence in support of the stolen property charge. Therefore, the admission of any evidence regarding the NCIC information was error clearly capable of producing an unjust result. R. 2:10-2.

B.

Both defendants argue that the judge permitted the State to introduce other inadmissible hearsay and opinion testimony that was highly prejudicial and denied them a fair trial. They cite Lazu's testimony that the location of the house under surveillance was a "hot spot" of violent drug activity, his opinion that people leaving the house had engaged in narcotics transactions, and that defendants had sold drugs to Diaz in the street outside the house.

We begin by noting that Lazu did not testify as an expert witness. Even though the judge sua sponte prompted the prosecutor to ask Lazu about his training and experience after one of defense counsel's objections, the prosecutor never sought to have Lazu qualified as an expert, the judge never recognized

23

him as an expert, and the jury was never provided with instructions regarding the evaluation of Lazu's testimony as expert opinion, as it was regarding the testimony of the State's ballistics expert.

N.J.R.E. 701 permits a non-expert witness to offer "testimony in the form of opinions" but "only . . . if it falls within the narrow bounds of testimony that is based on the perception of the witness and that will assist the jury in performing its function." State v. McLean, 205 N.J. 438, 456 (2011). "[U]nlike expert opinions, lay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 460 (citing N.J.R.E. 703) (emphasis added).

In Trentacost v. Brussel, the plaintiff sued her landlord after she was "mugged" in the unlocked common hallway of her apartment building. 164 N.J. Super. 9, 12 (App. Div. 1978), aff'd, 82 N.J. 214 (1980). We concluded that the plaintiff "produced sufficient proof" of the defendant's negligence, noting that although there were no reports of crime in the building, there were numerous reports of crime in its immediate area and the defendant was aware of unauthorized persons in the hallway on prior occasions. Id. at 16. We also held that a detective, who had investigated the crime against the plaintiff and had personally investigated between 75 and 100 crimes in the immediate

neighborhood, could offer an opinion that it was a "high crime area." Id. at 19-20. The McLean Court cited Trentacost, noting the detective's lay opinion testimony in that case was based on his personal perception and observation. 205 N.J. at 459 (citing Trentacost, 164 N.J. Super. at 19–20).

In this case, Lazu did not testify from personal observations and perceptions of the area. He said the area was "known" as a "hot spot," one of many on a "list" of hot spots throughout the city. He said, without any detail, that a "high level [of] narcotics investigations ha[d] been conducted" in the area, and there were shootings. Admissibility of lay opinion testimony of this kind must be "firmly rooted in the personal observations and perceptions of the lay witness in the traditional meaning of the Rule 701." Ibid. Lazu never testified about his own personal observations of the area, or his personal involvement in investigations or arrests in the area.[9]

---

[9]  Torres cites decisions from other states supporting the proposition that testimony about high crime areas is "irrelevant to the issue of guilt," Fleurimond v. State, 10 So. 3d 1140, 1145 (Fla. Dist. Ct. App. 2009), suggests the defendant has a "bad character or propensity" to commit crimes, Wheeler v. State, 690 So. 2d 1369, 1371 (Fla. Dist. Ct. App. 1997), and has "no relevancy to the charge that defendant possessed [drugs]" and "tended to show [his] 'guilt by association,'" Smith v. Commonwealth, 228 S.E.2d 562, 562–63 (Va. 1976). These cases are not precedential, although their reasoning is persuasive. We rely on our analysis of the testimony in this case and conclude it was not based

Instead, Lazu's testimony was simply hearsay, based on evidence obtained from out-of-court sources never disclosed, never introduced at trial and never subject to cross-examination. Defendant was denied the right to confront those sources before the jury. For nearly fifty years, our courts have recognized "both the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." State v. Branch, 182 N.J. 338, 350 (2005) (citing Bankston, 63 N.J. at 268–69) (emphasis added). Lazu's statement that defendants emerged from a house in a "hot spot," an area of known narcotic activities and shootings, incriminated defendants by implication.

The State reprises its argument, persuasive to the trial judge, that the jury was entitled to know why Lazu was in the area on surveillance. "It is well settled that the hearsay rule is not violated when a police officer explains the reason he approached a suspect or went to the scene of the crime by stating that he did so 'upon information received.'" Bankston, 63 N.J. at 268 (quoting McCormick, Evidence (2d ed. 1972) § 248, p. 587). However, Lazu did much more than that.

---

on Lazu's personal observations, and, therefore, was not admissible as lay opinion testimony.

He detailed the substance of that "information," i.e., the house was in a crime-ridden area on a list of hot spots known to police for violent drug transactions and shootings.

The highly prejudicial nature of this inadmissible evidence is obvious when we consider the judge's warning to the last two police witnesses not to mention anything that occurred before Lazu began his surveillance of the premises. The judge wanted to ensure the witnesses did not blurt out information peculiarly within the knowledge of law enforcement, but not based on personal observation and not disclosed to jurors, like the anonymous tip from a neighbor. We fail to see why the judge did not recognize that Lazu's testimony about the nature of the area was similarly inadmissible and prejudicial.[10]

_____

[10] This was not an evidentiary hearing on a motion to suppress, where, for example, hearsay evidence regarding the nature of the area and prior investigations and arrests in the area, is admissible. See N.J.R.E. 104(a)(1) ("The court shall decide any preliminary question about whether . . . evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege and Rule 403."). The admission of such evidence at a hearing on a motion to suppress does not deprive a defendant of his due process rights or violate the Confrontation Clause. State v. Williams, 404 N.J. Super. 147, 171 (App. Div. 2008); see also United States v. Raddatz, 447 U.S. 667, 679 (1980) (emphasizing that "the process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself").

Lazu's opinions that people he saw entering and leaving the house on Rosa Parks Boulevard, and his opinion that Correa-Martinez had engaged in a narcotics transaction with Diaz, were also inadmissible. In McLean, the Court squarely held that a police officer may not render his opinion that a drug transaction occurred because such an opinion is inadmissible as either an expert or a lay opinion. 205 N.J. at 461–63. A police officer testifying as a lay witness may only testify to fact testimony, "through which an officer is permitted to set forth what he or she perceived through one or more of the senses." Id. at 460.

Fact testimony "includes no opinion, lay or expert, and does not convey information about what the officer 'believed,' 'thought' or 'suspected,' but instead is an ordinary fact-based recitation by a witness with first-hand knowledge." Ibid. A lay witness is not permitted to testify about "the significance" or his interpretation of a series of events because that "does not fall outside the ken of the jury," but is instead something that the jury is equally capable of evaluating. Id. at 461. To permit a lay witness to opine on the meaning of what he saw, would, especially for police witnesses, permit an officer to opine on the defendant's guilt. Ibid. This was precisely what the judge permitted Lazu to do over defendants' objections.

The only close question is whether this inadmissible testimony requires reversal. The jury acquitted both defendants of all counts involving possession or sale of heroin, as well as possession of two of the three guns police claimed to have confiscated from them. Torres specifically argues, however, that the jury could have concluded someone who lives in a crime-ridden neighborhood where there are frequent shootings, in a house where multiple drug transactions occurred, is more likely to need a gun and therefore possess a gun. Additionally, the prosecutor highlighted Lazu's impermissible testimony several times during his summation.

"When evidence is admitted that contravenes not only the hearsay rule but also a constitutional right, an appellate court must determine whether the error impacted the verdict." State v. Weaver, 219 N.J. 131, 154 (2014) (citing Chapman v. California, 386 U.S. 18, 24 (1965)). "The standard has been phrased as requiring a reviewing court 'to declare a belief that [the error] was harmless beyond a reasonable doubt.'" Ibid. (alteration in original) (quoting Chapman, 386 U.S. at 24). We cannot conclude that this inadmissible evidence, in conjunction with the inadmissible and prejudicial NCIC evidence, was harmless beyond a reasonable doubt, and so we reverse defendants' convictions.

## III.

Because we reverse defendants' convictions, we need not address the other trial issues raised or defendants' arguments regarding their sentences. We do address Correa-Martinez's argument regarding the denial of his motion to suppress in the event the State decides to retry the case.

Lazu and Judeh testified at the pretrial evidentiary hearing on the motion to suppress, and the motion judge found their testimony credible. The judge denied the motion, concluding the search of the Honda was permitted by the automobile exception to the warrant requirement and was also a valid search incident to arrest.

Before us, defendant Correa-Martinez contends police lacked any justification for immediately ordering him out of the passenger side of the Honda and thereafter conducting a warrantless search of the car. Defendant relies primarily on State v. Robinson, 228 N.J. 529 (2017). The State argues that Judeh had a reasonable, articulable suspicion to justify opening the passenger door and engaging in a search based on the totality of the circumstances, including Lazu's observations of defendants and Torres' furtive movement at the gas station. The State argues this was not an impermissible protective sweep in violation of

30

Robinson, but rather a valid warrantless search permitted by the automobile exception and was also a valid search incident to arrest.

In State v. Bacome, the Court reaffirmed that "officers may remove passengers only when the circumstances present reason for heightened caution." 228 N.J. 94, 107 (2017). In this case, the combined information Lazu relayed, and the information Judeh had from Montoya's observations of Torres' motion in the car as it stopped at the gas station, was sufficient to meet that standard. See id. at 97–98, 108 (noting officers' prior knowledge of defendants' drug dealing, neighborhood complaints and the defendant's furtive movement reaching under the seat met heightened caution standard justifying removing passenger from vehicle).

At the hearing on the motions to suppress, Judeh testified that Torres reached down below the driver's seat while the Honda was parked at the gas station. At the time, Judeh did not place either defendant under arrest, but he entered through the front passenger door "to see what was being reached for." He observed the gun on the floor of the driver's side.

In Robinson, the Court recognized that "a police officer's warrantless search of the passenger compartment of a vehicle, following a lawful traffic stop, is a constitutional protective sweep when the circumstances give rise to a

reasonable suspicion that a driver or passenger is 'dangerous and may gain immediate access to weapons.'" Id. at 534 (quoting State v. Gamble, 218 N.J. 412, 432 (2014)). Correa-Martinez argues that because he and Torres were effectively in custody with the other two officers, there was no potential danger requiring Judeh's entry into the vehicle. See id. at 549 (concluding the protective sweep of the car was unjustified because the officers "assumed and maintained control of the vehicle and the scene").

However, in Gamble, the Court upheld the warrantless "protective sweep" of the passenger compartment of a van, finding it was "justified under the totality of the circumstances." 218 N.J. at 433. The Court cited a "confluence of factors" justifying the limited search, including 911 calls of gunfire, the late hour and high crime area, and furtive movements of the occupants as officers approached. Ibid.

Here, Judeh testified that defendants were not under arrest at the time of the stop at the gas station and, when the initial pat down of both yielded no weapons or drugs, presumably defendants would have been free to go. Yet, Judeh testified he had received information from Lazu that one of the occupants might have a gun, and Montoya said Torres had reached under his seat. In Gamble, the Court said: "once the officer completed the patdown of defendant

32

and did not locate the gun, it was reasonable for the officer to believe the van contained a gun. To permit defendant and his passenger to reenter the van before ensuring that it did not contain a weapon ignores the risk to officers and public safety." Id. at 434. The facts here more closely resemble those in Gamble than those presented in Robinson.

We affirm the denial of Correa-Martinez's motion to suppress, albeit for reasons other than those expressed by the motion judge.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION